

U.S. Department of Justice

United States Attorney
Eastern District of New York

MKM:TH/MKP  
F. #2017R01840

271 Cadman Plaza East  
Brooklyn, New York 11201

July 24, 2018

By Hand and ECF

The Honorable Nicholas G. Garaufis  
United States District Judge  
United States District Court  
225 Cadman Plaza East  
Brooklyn, New York 11201

   Re: United States v. Raniere, et al.  
     Criminal Docket No. 18-204 (NGG) (S-1)

Dear Judge Garaufis:

  The government respectfully submits this letter to set forth the government's position with respect to bail as to the newly arrested defendants – Clare Bronfman, Kathy Russell, Lauren Salzman and Nancy Salzman (the "defendants") – who were charged in the above-captioned superseding indictment. Defendant Bronfman will be making her initial appearance today at 3:00 p.m. before the Court. Defendants Russell, Lauren Salzman and Nancy Salzman will be arraigned in the Northern District of New York.

  For the reasons set forth below, the government respectfully submits that all four defendants pose a significant flight risk. The defendants should only be released on bonds commensurate with each defendant's respective financial resources, substantially secured where appropriate, and signed by financially responsible sureties unaffiliated with Nxivm. Moreover, the defendants should all be subject to additional conditions of release including electronic monitoring for all defendants and home confinement for Clare Bronfman and Lauren Salzman.

## BACKGROUND

 A. Overview

  On July 23, 2018, a federal grand jury in Brooklyn, New York returned a sealed superseding indictment charging the defendants (including Keith Raniere and Allison Mack, who were charged in the original indictment) with participating in a long-running racketeering conspiracy, among other crimes. The superseding indictment, unsealed

following the defendants' arrests, charges the defendants with racketeering conspiracy and charges Clare Bronfman with a separate count of identity theft and Lauren Salzman with separate counts of forced labor and wire fraud conspiracy.

The facts underlying the charges in the superseding indictment center around several pyramid-structured organizations that Raniere founded in the Albany, New York area, including Nxivm and various related entities, as well as an organization referred to as "DOS," which offered purported self-help programs. Nxivm offered classes based on Raniere's teachings, costing thousands of dollars each, and recruited members from all over the United States, including the Eastern District of New York, and elsewhere. Participants were encouraged to pay for additional classes and to recruit others to take classes in order to rise within the ranks of Nxivm.

In 2015, Raniere created a secret society called "DOS," which was comprised of "masters" who recruited and commanded groups of "slaves." DOS masters persuaded slaves to join DOS by describing it as a secret women's empowerment group or sorority. Prospective slaves were asked to provide "collateral" to prevent them from leaving the group or disclosing it to others. Collateral included sexually explicit photographs and videos, rights to financial assets, and videos or letters of (true or untrue) confessions that would be damaging to the prospective slave's family members and friends. After joining DOS, slaves were required to provide additional collateral and to pay "tribute" to their masters, including by performing tasks that would otherwise be compensable. In addition, several DOS slaves were directed to have sex with Raniere, whose participation in DOS was not disclosed. Aside from Raniere, all members of DOS were female.

As alleged in the superseding indictment, Raniere and an "inner circle," including the defendants, comprised an organized criminal enterprise (the "Enterprise") that engaged in various activities with the aim of promoting Raniere and recruiting others into Nxivm and DOS for financial and personal benefits. Members of Raniere's inner circle held high-ranking positions in one or more of the Raniere-founded organizations, including serving as executives, directors and officers of Nxivm. Some members of Raniere's inner circle also served as "first-line masters" directly under Raniere, meaning that they comprised the second-highest level within the DOS pyramid and that, other than Raniere, they wielded the most power within DOS.

B. Defendants

i. Clare Bronfman

Defendant Bronfman was a member of the Enterprise and a high-ranking member of Nxivm. She served on Nxivm's Executive Board from at least 2009 to 2018. Bronfman is named in three predicate acts. First, in Racketeering Act Two, Bronfman is alleged to have conspired to commit identity theft and to have committed identity theft. These predicate acts arise out of a scheme to obtain usernames and passwords of people believed to be Nxivm's enemies so their emails could be monitored by the Enterprise.

Second, in Racketeering Act Five, Bronfman is alleged to have encouraged and induced the illegal entry of an alien for Bronfman's financial gain and to have committed money laundering in order to facilitate that crime. Bronfman engaged in international wire transfers to make it fraudulently appear as if the victim had the financial resources to obtain an investor visa when in fact the victim did not. Third, in Racketeering Act Ten, Bronfman is alleged to have conspired to commit identity theft. Bronfman engaged in a monthly practice of facilitating Raniere's use of a dead person's credit card account by arranging to pay the monthly credit card bill using the dead person's bank account. Raniere used this credit card account as part of a scheme to avoid paying taxes by keeping his assets in the name of others. As a member of the Enterprise, Bronfman also has led efforts to discredit DOS victims and has orchestrated abusive litigation meant to intimidate and attack perceived enemies and critics of Raniere.

        ii.       <u>Kathy Russell</u>

Defendant Russell was a member of the Enterprise and a high-ranking member of Nxivm. She also served as Nxivm's bookkeeper. Russell is named in two predicate acts. First, in Racketeering Act One, Russell is alleged to have conspired to commit identity theft and to have conspired to unlawfully possess a false identification document. These predicate acts arise out of a scheme by co-conspirators to smuggle an alien into the United States through Canada after the alien was denied legitimate entry into the United States. Russell drove from Albany, New York to Toronto, Canada where she met the alien and provided her with an identification card bearing the last name and birthdate of a woman who had recently died. Using the false identification, the alien was granted entry into the United States and Russell drove her to Clifton Park, New York, where many members of Nxivm including Raniere lived. Second, as alleged in in Racketeering Act Two, Russell was also part of the scheme to obtain usernames and passwords of people believed to be Nxivm's enemies so their emails could be monitored by the Enterprise.

        iii.      <u>Lauren Salzman</u>

Defendant Lauren Salzman was a member of the Enterprise and a high-ranking member of Nxivm. She served on Nxivm's Executive Board from at least 2009 to 2018. She was also a first-line master in DOS. Lauren Salzman is named in three predicate acts and two substantive counts. In Racketeering Act Six, Lauren Salzman is alleged to have engaged in trafficking a victim for labor and services and document servitude. These predicate acts stem from years of abuse of an illegal alien living in Clifton Park, New York who was at one time a member of Raniere's inner circle and a sexual partner of Raniere's, in part to extract work from her. Eventually the victim was confined to a room as punishment after she developed romantic feelings for a man who was not Raniere. The victim had only sporadic visitors, including Lauren Salzman, who were tasked with "helping" the victim heal her "ethical breach" with Raniere. The victim was told that if she left the room she would be sent to Mexico without any identification documents.

While in the room the victim went for months-long stretches without any human contact. After nearly two years in the room, the victim left the room, and, as threatened, she was driven to Mexico without any identification documents. Once in Mexico, the victim repeatedly reached out to her family by email for help with her identification documents. Her family was instructed by co-conspirators, including Lauren Salzman, not to send the victim her documents and co-conspirators, including Lauren Salzman, directed the family to respond to the victim by demanding the victim resume performing services for the members of the Enterprise in order to see her family again. Indeed certain members of the victim's family did not speak to her again for many years.

The other predicate acts and substantive charges stem from Lauren Salzman's involvement as a first line master in DOS, by which she obtained property and services from her slaves based on material lies and omissions and through extortion. Lauren Salzman was also one of the leaders of a disinformation campaign designed to disseminate lies about DOS to Nxivm members and others in order to discredit victims.

    iv. Nancy Salzman

Nancy Salzman was a member of the Enterprise and the President of Nxivm. She is Lauren Salzman's mother. Nancy Salzman is named in two predicate acts. First, Nancy Salzman is named as part of the conspiracy in Racketeering Act Two to commit identity theft by obtaining the usernames and passwords of perceived enemies of Nxivm in order to monitor their email accounts. Second, Nancy Salzman is named in Racketeering Act Three as part of a scheme to alter records for use in an official proceeding. That predicate act stems from a lawsuit Nxivm filed against a cult deprogrammer and a former student, among others. The former student countersued alleging various consumer perception claims stemming from Nxivm's curriculum. In discovery, Nxivm was ordered to produce videos of Nancy Salzman teaching courses the student had taken. Nxivm opposed this request initially but eventually relented and claimed to have provided "unedited" copies of the videos. In reality, co-conspirators, including Nancy Salzman, agreed to edit the videos to remove material that they believed would have supported the former student's claims and to make it look as if the videos were unedited.

Moreover, Nancy Salzman in her role as second-in-command to Raniere within Nxivm, was instrumental in exalting Raniere's teaching and ideology and in promoting a culture of absolute commitment and deference to Raniere. Nancy Salzman also personally encouraged many students to go into debt in order to take expensive Nxivm classes or to enter into low value "exchanges" by which students would take a week-long class in exchange for teaching that same class three times. Nancy Salzman, a registered nurse, also developed purportedly therapeutic techniques called "Explorations of Meaning" ("EMs"), which were sometimes used in coercive ways to manipulate Nxivm students.

ARGUMENT

I.  Legal Standard

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight.  18 U.S.C. § 3142(e) ("no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community").  A finding of dangerousness must be supported by clear and convincing evidence.  United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).  A finding of risk of flight must be supported by a preponderance of the evidence.  United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.  In addition, a court may also order detention if there is "a serious risk that the [defendant] will ... attempt to obstruct justice, or ... to threaten, injure, or intimidate, a prospective witness or juror." 18 U.S.C. § 3142(f)(2)(B); see United States v. Friedman, 837 F.2d 48 (2d Cir. 1988).

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant, including the person's "character . . . [and] financial resources"; and (4) the seriousness of the danger posed by the defendant's release.  See 18 U.S.C. § 3142(g).  Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means.  See 18 U.S.C. § 3142(f)(2); see also United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004) (bail hearings are typically informal affairs, not substitutes for trial or discovery); United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); Ferranti, 66 F.3d at 542 (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).

II.  The Defendants Pose a Significant Risk of Flight

A substantial secured bond is necessary based on the flight risk posed by the defendants in light of (1) the nature and circumstances of the offenses, including the fact that many of the offenses are crimes of deceit and that the defendants face lengthy prison sentences; (2) the strength of the government's case against each defendant; (3) the history and characteristics of the defendants including Clare Bronfman's extraordinary wealth and foreign ties as well as Lauren Salzman and Nancy Salzman's wealth and foreign travel; and (4) the risk of obstruction of justice in this case posed by Clare Bronfman and Lauren Salzman.

A. <u>The Offenses are Serious, Involve Crimes of Deceit and the Defendants Face Lengthy Sentences</u>

The charges in the indictment are properly characterized as serious due to the statutory penalties, the duration and complexity of the criminal conduct and the fact that the charges include multiple crimes of deceit, which courts have held is relevant to the risk of flight analysis. See United States v. Williams, 654 F. App'x 3, 4 (2d Cir. 2016) (summary order) (finding district court did not commit clear error in finding defendant posed a risk of flight where, among other things, the district court had noted that it was "struck by the fact that a number of [the charges] involve deceit"); United States v. Dimora, No. 1:10CR387, 2012 U.S. Dist. LEXIS 86457, at *8 (N.D. Ohio June 21, 2012) (considering a defendant's ability to use the same "skills of deceit and evasion" that he used to commit crimes to "elude capture"); United States v. Saani, 557 F. Supp. 2d 97, 98-99 (D.D.C. 2008) (defendant's "alleged purposeful and illegal concealment of . . . access" to funds in foreign bank accounts was "directly relevant to [his] flight risk").

The defendants are all facing charges of criminal conduct spanning many years, including racketeering conspiracy, which weighs in favor of a finding of a risk of flight. Moreover, Clare Bronfman, Kathy Russell and Nancy Salzman are all named in predicate acts (and, as to Bronfman a substantive count as well) alleging their participation in multiple crimes of deceit including identity theft as to all three defendants, money laundering as to Bronfman and altering of records in a federal case as to Nancy Salzman.

Lauren Salzman is charged substantively with wire fraud conspiracy, also a crime of deceit, premised on her having obtained property from DOS slaves based on the false claim that DOS was a women-only organization and the material omission that Raniere was the head of the organization. Indeed, all of the DOS-related crimes committed by Lauren Salzman reflect a willingness to commit crimes through lies and manipulation because the truth about the organization was kept from everyone who joined except for the first-line masters. Additionally, as to Lauren Salzman, the serious nature of her crimes is reflected by her having trafficked victims for labor and services.

The significant term of imprisonment that the defendants face upon conviction provides a strong incentive to flee. The racketeering conspiracy count alone carries a statutory maximum sentence of 20 years for each of the defendants. See <u>United States v. Dodge</u>, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight). Bronfman is also facing an additional count of identity theft with a statutory maximum sentence of 15 years. Lauren Salzman is also facing additional counts of forced labor and wire fraud conspiracy, which each carrying additional statutory maximum sentences of 20 years.

B. <u>The Government's Evidence is Strong as to Each Defendant</u>

The government's case against the defendants is strong. The government will prove at trial that the defendants engaged in the racketeering conspiracy and, where applicable, the substantive offenses charged in the superseding indictment. The government's proof will include, among other evidence, testimony from numerous witnesses, including members of the charged conspiracies; emails and other types of documentary evidence reflecting the defendants' knowledge and participation in the schemes; and banking, financial and corporate records. To give just a few examples of the government's proof:

- Bronfman is charged in an identity theft conspiracy involving the use of a credit card and banking information belonging to one of Raniere's sexual partners after her death in November 2016. Between November 2016 and November 2017, Bronfman sent Raniere regular emails documenting expenses charged to the woman's credit card for Raniere's "review and approval." The expenses charged to the woman's credit card after her death included payments to a chiropractor for Raniere's benefit, as well as thousands of dollars' worth of clothing and shoe purchases for the mother of Raniere's child.

- Multiple witnesses corroborate the details of the predicate acts in which Kathy Russell is named and documentary evidence corroborates those accounts.

- Nancy Salzman is named in a predicate act stemming from conspiracy to alter records for an official proceeding, with regard to records produced in a civil case in July 2008. Documentary evidence, including a contemporaneous email to Nancy Salzman, confirms the scheme to intentionally alter the records.

- Lauren Salzman is named in a predicate act stemming from trafficking of a victim from at least March 2010 through April 2012. Once the victim was sent to Mexico without any identification documents, Lauren Salzman participated in email discussions concerning how to respond to the victim who was pleading with her family to send her the identification documents. For instance, on February 29, 2012, the victim wrote to her father (a follower of Raniere): "Without my papers I cannot do anything about my visa, at all. I am so sad. I cry every time I am alone. . . . Why wont you send me my papers? . . . i will pay you for sending them if that is what you want. There is nothing I can do without them. . . . I have been trying to survive." This email was then forwarded to Lauren Salzman and other co-conspirators, and Lauren Salzman agreed with a decision by the group to continue not to send the victim her papers and said in various emails that the victim was "gameplaying" and criticized the victim for having "failed to submit a concise plan" for completing her Nxivm-related work. As to Lauren Salzman's participation in DOS, the government possesses significant electronic evidence corroborating witness accounts of her involvement as well as bank account authorizations and sexually explicit photographs and videos that were provided to Lauren Salzman based on lies or extortion.

## C. The Defendants' History and Characteristics Demonstrate a Serious Risk of Flight

### i. Clare Bronfman

Clare Bronfman is a woman of extraordinary wealth with access to significant assets in several places around the world. A defendant's financial resources are a relevant aspect of her "history and characteristics." 18 U.S.C. 3142(g)(3); see United States v. Patriarca, 948 F.2d 789, 795 (1st Cir. 1991) (explaining that a district court should consider the extent of defendant's assets and net worth before determining the amount of property to be posted as forfeiture condition).

Bronfman is the daughter of the former chairman of the Seagram Company, whose net worth was estimated to be approximately $2.6 billion. In a 2011 deposition, Bronfman testified that her grandfather established trust funds for each of his grandchildren which provided her with substantial assets with which to invest. Bronfman testified that she loaned $65 million to Raniere to trade in commodities markets, which Raniere thereafter lost and which Bronfman did not recoup. In the same deposition, Bronfman testified that she did not make a "single investment" in her "own name" and that there was "a veil [she] always wanted to maintain." Bronfman has incorporated and registered a number of entities, in various names, in California, Virginia and Connecticut.

Bronfman is a frequent international traveler, with access to a private jet, and has an ownership stake in a private island in Fiji's Lomaiviti Archipelago. Within the last three years alone, Bronfman has traveled to Mexico City, Paris, Toluca, Guadalajara, Monterrey, Vancouver, Israel, Fiji, Havana and Toronto. Extensive travel of this nature further evidences a risk of flight. See, e.g., United States v. Anderson, 384 F. Supp. 2d 32, 36 (D.D.C. 2005). Bronfman also has family living overseas including her mother and her sister.

There can be little doubt that Bronfman is in a position to abandon millions of dollars in cash and property and still live comfortably. These resources and the ease with which Bronfman could flee and live outside the reach of law enforcement makes the risk of flight extraordinarily high in this case, particularly when considered in conjunction with the strength of the government's case and the lengthy sentence the defendant could receive if convicted.

### ii. Lauren Salzman

Lauren Salzman's personal characteristics also weigh in favor of a finding that she poses a risk of flight. Lauren Salzman has significant assets including a home. According to multiple witnesses, as one of the highest-ranking members of Nxivm, Lauren Salzman presented herself as an example of the level of financial success other members of Nxivm could have by recruiting others into Nxivm. Moreover, a number of Nxivm-affiliated companies that have generated revenue are held in Lauren Salzman's name including Jness, a women's program. Additionally, Lauren Salzman also has contacts all over the world from her work with Nxivm and in the past five years she has traveled extensively including to

Mexico, Fiji and Canada.  Indeed, when Raniere was originally apprehended in Mexico, Lauren Salzman was staying at a luxury resort with him while he was in hiding.  According to public records, Lauren Salzman currently has a federal tax lien filed against her for $32,548.  Lauren Salzman also had a previous tax lien in 2009, which was released in 2011.  Lauren Salzman's apparent willingness to flout her tax obligations raises a further risk of nonappearance.

### iii. Nancy Salzman

Nancy Salzman's personal characteristics also weigh in favor of a finding that she poses a risk of flight.  Nancy Salzman has significant assets including a home and many Nxivm-affiliated businesses in her name including First Principles, which purports to own Nxivm's intellectual property and various real estate holding companies.  Moreover, multiple witnesses have informed the government that Nancy Salzman secrets cash in her home and when a search warrant was executed on her home, over a half a million dollars was seized.  Nancy Salzman also has contacts all over the world from her work with Nxivm and in the past five years she has traveled extensively including to Mexico, England, Germany and Fiji.

### iv. Kathy Russell

Kathy Russell's personal characteristics also weigh in favor of a finding that she poses a risk of flight.  Russell left her family in Alaska to become a bookkeeper for Nxivm fourteen years ago.  She is described by at least one witness as adventuresome and capable of driving long distances alone.  Indeed, one of the predicate acts in which she is named involved her facilitating an illegal border crossing.  Additionally all of Russell's contacts outside of Nxivm are geographically distant, primarily in Alaska, giving her an additional incentive to flee.

Russell's risk of flight is further evidenced by a history of tax liens and judgments against her, which evidence a lack of respect for the law and a risk of nonappearance.  For example, according to public records, in 2006 Russell had a $9,631 federal tax lien filed against her, in 2012 Russell had a $36,714 federal tax lien filed against her and in 2013 Russell had a $3,510 judgment issued against her in favor of a credit union.

### D. The Risk of Obstruction is High

In addition to considering the defendant's risk of flight, the Court may also consider how best to reduce the risk of obstruction of justice in setting bail conditions.  18 U.S.C. § 3142(f)(2)(B).  Both Bronfman and Lauren Salzman present significant risks of obstruction.

Evidence obtained during the investigation has demonstrated that Bronfman went to significant lengths to compile information and threaten litigation against those she considered to be an enemy or critic of Raniere.  As one example, a January 26, 2016 email from Bronfman to Raniere attached an excel spreadsheet, authored by Bronfman, titled "Adverse Party Identifying Info."  The spreadsheet contains the names, telephone numbers,

and email addresses of dozens of individuals deemed adverse to Raniere, including reporters and a victim of a crime alleged in the superseding indictment.  Another spreadsheet created by Bronfman and sent to Raniere on September 14, 2017 is titled "Individuals Involved" and contains a list of individuals and the purported "damage" they caused to Raniere-created entities.  One column in the spreadsheet is titled "Crime," under which Bronfman documented the supposed crimes each individual committed against Raniere, and another column in the spreadsheet is titled "Priority Level," with numbers listed beneath.

This conduct is particularly relevant because a court may also order detention if there is "a serious risk that the [defendant] will ... obstruct or attempt to obstruct justice, or . . . intimidate . . . a prospective witness," among other things.  18 U.S.C. § 3142(f)(2)(B); see United States v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988).  Bronfman's involvement in efforts to target and silence critics of Raniere is particularly concerning in light of the broader pattern of harassment, coercion and abusive litigation that is described as one of the means and methods of the conspirators in the superseding indictment.  As to Lauren Salzman, after the media began reporting on DOS, Lauren Salzman helped gather information for Bronfman about victims and potential witnesses that could be used against them.

## CONCLUSION

For the reasons set forth above, the government respectfully submits that the defendants pose a significant risk of flight and should not be released unless and until they have posted substantial bonds, secured where appropriate, commensurate with their assets.  The bonds should also signed by financially responsible sureties who are unaffiliated with Nxivm.  Furthermore, all of the defendants should be on electronic monitoring because of their minimal ties to the Eastern District of New York.  Other conditions of release should also be imposed including that none of the defendants should be permitted to have contact with any other current or former members of Nxivm (except blood relatives) or any affiliated organizations.

In the case of Clare Bronfman, because of her extraordinary wealth and extensive foreign ties, the amount of the bond should be substantial and largely secured.  Because of the heightened risk of flight posed by Bronfman as well as the additional risk of

obstruction posed by both Bronfman and Lauren Salzman, if released, Bronfman and Lauren Salzman should also be subject to the condition of home confinement.

          Respectfully submitted,

          RICHARD P. DONOGHUE
          United States Attorney

By:   /s/
      Moira Kim Penza
      Tanya Hajjar
      Assistant U.S. Attorneys
      (718) 254-7000

cc:    Hon. Nicholas G. Garaufis (by hand and ECF)
      Defense Counsel (by email)
      Clerk of Court (by ECF)